SPENCER SULLIVAN, Adm'r, plaintiff in error, *vs.* ANDERSON HUGLY, *et al.*, by next friend, WILLIAM W. COLLIER, defendants in error.

1. A witness will not be permitted to prove the opinions of others on any question.
2. Where the verdict is against the issue of adulterine bastardy, this Court will not disturb the finding, unless a case of plain, natural impossibility has been made out by the evidence.

In equity, in Monroe Superior Court. Tried before Judge CABANISS, at August Term, 1860.

Amos Hugly and his wife Caroline had born to them during their coverture, a male child, Franklin Hugly. When Franklin was born they lived in Upson county. They afterwards moved to Chattooga county, where Amos Hugly died; his widow next died, and then Franklin also died.

This bill is brought against Spencer Sullivan, as administrator of Franklin Hugly, for an account and distribution, by William W. Collier, as next friend of Anderson Hugly, and nine others, minors, who allege that they are the next of kin, and heirs-at-law of Franklin Hugly, on the paternal side, and entitled to ten-fourteenths of his estate, and that James, John, Charles and Thomas Sullivan are his next of kin on the maternal side.

Spencer Sullivan, in his answer, while admitting his liability to account with the heirs-at-law of Franklin Hugly, both for the whole of his estate which came into his hands as administrator, and for the hire of the negroes belonging

thereto, denies that complainants have any right to any part of said estate, they not being the next of kin on the paternal side, of said Franklin, as they allege. He further answers, that the estate claimed by complainants is subject to distribution among the brothers and sisters of Caroline, the wife of Amos Hugly, (and who was the daughter of defendant,) and that he had distributed it among them, taking from them, who are also his children, refunding bonds, to save him harmless by reason of said distribution.

The only point at issue is, whether or not the complainants are the next of kin, on the paternal side, of Franklin Hugly, and the grounds relied on by the administrator will fully appear from the plea filed by him, as follows:

" That the said Franklin Hugly was the adulterine bastard child of Caroline, the wife of Amos Hugly, and was a half-breed of the African race, and by reason thereof incapable of taking or holding by bequest or otherwise, estate, real or personal, under the laws of this State. And further, that the estate sought to be distributed by complainants was, by the will of Amos Hugly, bequeathed in equal portions to his wife Caroline and said Franklin, and that said Franklin being an adulterine bastard, and one-half negro blood, and incapable of holding estate, real or personal, the bequest to Franklin became void, and the whole of the estate of Amos Hugly vested in Caroline Hugly, who was the sole heir-at-law of Amos Hugly."

The matter relied on in the pleas is also set up in defendant's answer.

The case came on for trial at the August Term, 1860, and and complainants proved their relationship to Amos Hugly, as stated in their bill, and the relationship of the Sullivans to Caroline, the wife of Amos Hugly. They also proved the value of the negroes in controversy and their hire to be worth more than $15,000 00.

BENJAMIN ZELNER testified: That he once had a conversation with Amos Hugly when said Amos was very mad because the child, Franklin Hugly, was reported to be a negro child, and said to witness he believed the child to be

his; if he had not, he would make more fuss about it than anybody else, and would discard or leave his wife, Caroline; was acquainted with the Sullivan family, they were of dark complexion, dark hair; knew some persons of darker complexion. Amos Hugly's father had a fair skin; his wife was a fair skinned and very pretty woman. Spencer Sullivan and all the family have high cheek bones and long noses.

L. B. ALEXANDER testified : He knew Amos Hugly but not intimately : he was red haired, fair skinned, and had many dark freckles on his face of a large size, and on looking on the side of his (Amos's) face it made him think of a negro, but not that Hugly was himself a negro.

Defendant read the answers to interrogatories of WAT-SON A. CRAWFORD and his wife, MARGARET CRAWFORD, who testified : They lived near Amos Hugly, in Upson county. Caroline Hugly gave birth to a male child, Franklin Hugly, while living in Upson. Mrs. Crawford saw the child about fifteen minutes after its birth, Watson Crawford saw it about two weeks after, both say it was the darkest child they ever saw born of a white woman. Mrs. Crawford says, from the dark color of Franklin Hugly, his curly black hair and low forehead, she would say he was one-half negro. Watson Crawford says that said Franklin was one-half of the negro race. They both say that Amos Hugly was subject to fits, and that his mind was weak and feeble, and that he was easily imposed upon. Watson Crawford says that he could have made him give witness his land. This witness also says that Amos Hugly told him that whenever he went from home he directed a negro man to sleep in the house where his wife slept. Both say that Amos Hugly was very fair skinned, freckled, and had red hair; his wife was fair skinned, rosy cheeks, handsome face, and black hair. Franklin was dark, thick skin, flat nose, and curly, black hair. Both say that Amos treated Franklin as his son.

Defendant then read the answers to interrogatories of Dr. DUDLEY W. HAMMOND, as follows :

I am a physician of thirty years standing. The wife of Amos Hugly, several years after their marriage, gave birth

to a male child of dark complexion or color, and I am of the opinion that said offspring was a mulatto, or, in other words, half negro—an adulterine bastard. This child differed from the pure white race in several particulars, and in order to arrive at this conclusion more clearly, it may be proper here to give, in detail, some of the most prominent characteristics existing between the white and negro variety of the human race. The Caucassian or white variety, as a general rule, is characterized by a fair white skin, red cheeks, soft, flowing hair, generally curled or waiving, ample broad forehead, small, oval and straight face, with features distinct, large elevated cranium, narrow and prominent nose, small mouth, projecting chin, etc. Amos Hugly and his wife, and their ancestors on either side, as far as I am acquainted, were in the main characterized by the above indications of purity. The Ethiopian or negro variety, on the other hand, is characterized by dark skin, black, short woolly hair, compressed skull, and elongated anteriorly, forehead low, narrow and receding, cheek bones broad and prominent, so as to render the upper front teeth oblique, so projecting, usually, as to extend beyond a straight line dropped from the end of the nose to the chin, eyes full, nose broad and flat, lips (especially the upper) thick, facial angle deficient, etc.

The child of Amos Hugly departed, or was wanting in many developments existing in its parents, or the white race, and instead, was indelibly impressed with those pertaining to the negro variety as just detailed : skin dark, resembling the mulatto or half blood, eyes large and prominent, nose short, and hair black, the facial angle deficient; in short, the whole contour of the child's countenance or appearance would at once impress upon the mind that it was the offspring of a negro, and I have no hesitation in stating this to be my opinion. I saw the child frequently, and examined it closely, for the purpose of ascertaining whether it was a white child or a mulatto. I know nothing more going to show the child to be a mulatto, except some inferential circumstances, viz : Hugly and his wife lived together for many years before

this child was born, and several years afterwards, and had no other.

Defendants here offered to read the following from Dr. Hammond's answers: "The midwife, Mrs. Cooper, who attended Mrs. Hugly in her accouchment, pronounced it to be a mulatto at its birth," which, on motion of complainants' counsel, was rejected by the Court, and defendants excepted; and afterwards, defendant, the death of Mrs. Cooper being shown, offered to read the testimony which had been rejected, and the Court again, on objection by complainants, rejected the same, and defendants excepted.

Defendants then continued the testimony of Dr. Hammond: Amos Hugly had a weak, imbecile mind; he was a simpleton. I do not know how often I saw the child, and can't say how old he was when I last saw him. I saw him a short time after his birth.

The evidence being closed, and the Court having charged the jury, (no exception is made to the charge,) they retired and found a verdict in favor of complainants for $10,710 00.

Defendants moved for a new trial on the grounds—

1. That the verdict and decree was contrary to law.

2. That the verdict and decree were contrary to the charge of the Court, and that the Court erred in rejecting the sayings of Mrs. Cooper.

3. That the verdict and decree were contrary to the evidence, contrary to the decided weight of evidence, and without evidence.

The Court overruled the motion and refused a new trial, and this refusal is the error complained of.

HAMMOND & SON, for plaintiff in error.

TRIPPE, GIBSON, for defendants in error.

*By the Court*—LYON, J., delivering the opinion.

What the midwife, Mrs. Cooper, said of the child, at the time of its birth, was hearsay, not evidence, and properly rejected. The statement was nothing but an opinion, and if

Sullivan *vs.* Hugly *et al.*

sustained by her oath would have been of but little weight ; without, it was a mere idle declaration.   The opinions of persons cannot be proven or used as evidence in this way— that is, a witness will not be permitted to prove the opinions of others on any question.   Robbins vs. Treadway, 2 J. J. Marsh, 542.

There is but one other point in the case, and that is wheth-er the verdict is so strongly and decidedly against the weight of the evidence as to require us to send the case back for a new trial.   The only question in issue before the jury was, whether the child, Franklin, under whom complainants claim, was the legitimate offspring of Amos Hugly and his wife, Caroline.

At the birth of the child, Amos Hugly, and its mother, Caroline, were husband and wife, living together ; had been for years preceding, and so continued for years afterward, and until the relation was dissolved by death.   Both parents hav-ing died, and then the child, and its estate administered by the defendant in the Court below, this bill was filed by the complainants as its next of kin, on the father's side, as a part of the heirs-at-law of said deceased child.   The defendant resisted their right to a distribution, insisting, that although said Franklin was born in the wedlock of the said Amos and his wife, Caroline, he was not the issue of the said Amos, but that he was the illegitimate offspring of an adulterous inter-course between the said Caroline and a negro.

On the hearing of that issue, the jury, upon the proofs submitted, rendered a verdict in favor of the complainant, and the legitimacy of the child.

2.   No question that has been before this Court has been more carefully considered and better settled than that in-volved in this record—adulterine bastardy ; and the rule, as settled, is, "that although the birth of a child in wedlock raises a presumption that such child is legitimate, yet that this presumption may be rebutted, both by direct and presump-tive evidence ; and in arriving at a conclusion upon this sub-ject, the jury may not only take into their consideration proof tending to show the physical impossibility of the child born

in wedlock being legitimate, but they may decide the question of paternity by attending to the relative situation of the parties, their habits of life, the evidence of conduct and declarations connected with conduct, and to any inductions which reason suggests." In other words, that the jury are not limited in their inquiries to the "*non access*," or physical impotency of the husband, but that they must act upon any evidence that will show the *absolute impossibility* of the husband's being the father of the wife's child, *from whatever cause that impossibility might arise.* Wright vs. Hicks, 12 Ga., 158. S. C., 15 Ga., 160.

But while the maxim of *pater est quem nuptiæ demonstrant* may be thus overturned and defeated, the Courts will not allow it to be disturbed upon light, unsatisfactory, or mere probable grounds. Resting, as the maxim does, on the solid foundation of public utility, the repose of families and the tranquillity of marriages, it will be presumed in all its force, unless combated by proofs stronger and more convincing. It is to be considered as the truth until it is destroyed. "The general presumption will prevail, except a case of plain, natural impossibility is shewn. I will not say the improbability of his being such, for upon the ground of improbability, however strong, I would not venture to proceed." Lord Ellenborough in The King vs. Luffe, 8 East., 193.

The evidence relied on by the defendant to overcome the presumption of legitimacy, are the opinions of three witnesses, Crawford, and his wife Margaret L., and Dr. Hammond. Crawford and his wife were near neighbors of Hugly and his wife at the birth of the child, Franklin, and from an examination at or near that time, they were of the opinion that the child was the descendant of a negro—that he was half negro. They say that he was of dark color, curly, black hair, and low forehead. Neither of these witnesses are experts, or profess any skill in physiology, genealogy, or ethnology. They saw that the child was of a very dark skin, had a low forehead, with short, curly, black hair, and from these they infer, as neither the father nor mother possessed any of these characteristics, that the child was begotten by a negro,

and not the husband.  The testimony of Dr. Hammond is to the same purport, but is much stronger and more important, from the fact, that he is a scientific and learned gentleman on the subject of the races, and examined the child at different times "closely, for the purpose of ascertaining whether it was a white child or a mulatto." He found it to be "wanting in many developments existing in its parents,' when he considered together with their ancestors on either side "as good portraitures of the unadulterated white race," "and, instead, was indelibly impressed with those pertaining to the negro variety,"—"skin dark, resembling the mulatto, or half blood, eyes large and prominent, nose short, and hair black—the facial angle deficient." He concluded that the child was "the offspring of a negro—in his opinion, an adulterine bastard." If these opinions were infallible, then it was an absolute impossibility for the child to have been the legitimate offspring of Amos Hugly, but they are not. The child, notwithstanding these traits or characteristics, might have been the child of Amos Hugly. We constantly see departures in the negro and white races, from the peculiar and natural characteristics of these respective varieties, more glaring and striking than those pointed out by these witnesses, and yet the parents of the descent can not be questioned.

The defect in the evidence is, that there is not enough of concurrent testimony to this point to overcome the legal presumption in favor of the legitimacy.  The examinations were made when the child was quite young, and before its features were fully developed.  To sustain the issue, more witnesses should have been brought to the examination. The testimony of one physician, learned and skillful, as he was, should have been corroborated by that of others skilled like himself, and the examination should have continued down to his death.  Now, after the child was removed with its parents to the county of Chattooga, among strangers to them and their antecedents, no one seems to be impressed with the idea that there is anything strange or peculiar in the appearance of the child, or that it was of negro descent. At least no witness from that locality is introduced to tes-

tify to this point, whose testimony supports the issue. One witness, Harlon, was sworn, who knew them in Chattooga. He not only does not say anything about the child being of negro descent or presenting that appearance, but he says he knew the child well; saw it frequently; it was always treated kindly by them, and both husband and wife claimed it as their child. In addition to this, it was in evidence that Amos Hugly, the father, had no doubt on the subject, although his attention was called directly to the fact; he rejected the idea indignantly. This was very strong evidence in support of the legal presumption—sufficient of itself to overcome the effect of the opinions of the other witnesses—for the father has an opportunity of judging of the legitimacy of the birth of his child that others are not supposed to have. . Besides all this, there is no evidence of any kind, either directly or indirectly, that the wife was guilty of adultery at all, unless it be taken for granted that the child is the offspring of a negro, and the adultery be presumed from that fact. The evidence is altogether insufficient to destroy the presumptions in favor of the legitimacy of the child and the innocence of the mother.

But suppose that this Court was of the opinion, from the evidence, that the child was half negro, and therefore necessarily an adulterine bastard, which opinion we do not entertain. What right have we to overturn this verdict? The question is one peculiarly for the jury in cases of this kind, and the evidence, to support the charge of bastardy, "must be of such *facts and circumstances* as are sufficient to *prove to the satisfaction of the jury* that the husband could not, by the laws of nature, be the father of the child." Ranbury Claim of Peerage, 2 Selw., N. P., 709. Shall this or any other Court under that rule, in cases like this, say that the jury *shall* be satisfied with this or that kind of evidence, especially when the whole charge rests upon the opinions of witnesses against the maxim and the deliberately expressed declaration of the father that the child was his? We think not. The most that the evidence could amount to is to raise a doubt, and whenever that is the case, the finding must be

in favor of the innocence of the mother and the presumptions of the law.

Let the judgment be affirmed.